IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHRYN F., et al.          :    CIVIL ACTION
                          :
        v.             :
                          :
WEST CHESTER AREA SCHOOL    :
DISTRICT                :    NO. 12-6965

MEMORANDUM

McLaughlin, J.                       December 18, 2013

       This case was brought by K.F. and her parents under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 et seq., section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., requesting that this Court overturn the Hearing Officer's decision and award them compensatory education and tuition reimbursement.  At issue in this case is whether the West Chester Area School District ("West Chester") provided K.F. with a free appropriate public education ("FAPE").

       The Hearing Officer concluded that while the evaluation upon which West Chester premised K.F.'s Individual Education Program ("IEP") was "flawed," West Chester did not deprive K.F. of a FAPE or her parents of a meaningful opportunity to participate in the IEP process.  The plaintiffs

argue that the Hearing Officer's conclusion was erroneous and that he incorrectly denied claims for compensatory education and tuition reimbursement.  All parties have filed motions for judgment on the administrative record.

Under the IDEA, this Court conducts a modified de novo review of the administrative record.  Giving the appropriate deference to the Hearing Officer's factual findings and having reviewed the complete administrative record, the Court finds that there was no denial of a FAPE under the IDEA.  Therefore, the Court need not reach the issues of (1) whether K.F. is entitled to compensatory education, or (2) whether the parents' placement of K.F. at Woodlynde, a private school, was appropriate, thus entitling them to tuition reimbursement.  For the same reasons that there is no denial of a FAPE under the IDEA, the plaintiffs' ADA and RA claims also fail.  The Court will therefore grant the defendant's motion and deny the plaintiffs' motion.

I.    The Administrative Record

K.F. is now eighteen years old and previously resided with her parents and two siblings.  K.F. was adopted by her parents from a Polish orphanage when she was almost four-and-a-half years old.  She weighed twenty-two pounds, and was diagnosed with "failure to thrive" when she was adopted.  K.F.

spoke only Polish at that time, but "testimony and evidence clearly indicates that [K.F.] . . . communicates in English and should not be regarded as an English language learner." Admin. R., Ex. 2 ("Decision") ¶ 1, at 2; see also J-5 at 1-2.[1]

K.F. attended kindergarten and first grade at a charter school. J-29 at 1, J-40 at 5. K.F.'s parents homeschooled her at the end of first grade. J-29 at 1. K.F. was in a charter school for second grade. J-40 at 5. K.F. then attended elementary schools in the West Chester Area School District for third, fourth, and fifth grades. J-1, J-2, J-4, J-29 at 1-2, J-40 at 5-6. By fifth grade, K.F. had been placed in lower track classes with some students with behavioral issues, so K.F.'s parents withdrew her from West Chester. K.F. was homeschooled for part of fifth grade through eighth grade. J-29 at 2, J-40 at 6.

K.F. attended a high school in the West Chester Area School District for ninth, tenth, and part of eleventh grade. Compl. ¶ 43. K.F.'s parents unilaterally placed her in a private school, Woodlynde, on February 2, 2012, during her eleventh grade year. Id. ¶ 44.

_____

[1] Copies of all of the parents' exhibits (P-1 through P-3, and P-8 through P-17) are located in Exhibit 13 of the administrative record. Copies of the joint exhibits (J-1 through J-35, J-38 through J-67, J-69, J-70, J-72 through J-80, and J-83 through J-89) are located in Exhibit 14 of the administrative record.

In total, K.F. was enrolled in the West Chester Area School District for less than five years of her total elementary and secondary education.  She received special education services from West Chester during those times, which are less than half of the typical period of elementary and secondary schooling.  She spent two-and-a-half years of her high school education at West Chester.

A. K.F.'s Disabilities

K.F. has average to high cognitive abilities but specific learning disabilities, including double deficit dyslexia.  J-40 at 20-21.  Double deficit dyslexia is a type of reading disability that derives from orthographic and phonological processing deficits that impede decoding, encoding, and spelling.  Pls.' Mot. ¶ 1, at 2 (citing J-40 at 15, 24, J-74 at 18-20, Admin. R., Ex. 11, N.T. at 332).  This disability was first identified in an independent educational evaluation arranged by K.F.'s parents in early 2011.  J-40 at 15.  K.F. has also been diagnosed with specific learning disabilities in reading fluency, written expression, and listening comprehension, as well as deficits in receptive and expressive language.  J-40 at 21.  Finally, K.F. has been diagnosed with attention deficit hyperactivity disorder ("ADHD").  Id.

B. Evaluations and IEPs

K.F. underwent a number of evaluations and other testing, both by West Chester and by independent providers at the request of her parents.  As a result, her IEP underwent multiple revisions and was discussed at numerous IEP meetings. In fact, there were fourteen IEP team meetings in K.F.'s two-and-a-half years of high school at West Chester.  11/8/13 Tr. at 23:22-24:1.

1. 2009-2010 (Ninth Grade)[2]

a. 2009 Reevaluation

Before K.F. returned to West Chester for high school, West Chester reevaluated her on August 6, 2009, as to whether she continued to need special education or related services. J-5; Admin. R., Ex. 12, N.T. at 69.  The reevaluation was conducted by West Chester's school psychologist, Percell Whittaker, included parental input and multiple formal

---

[2] The parties conceded at oral argument that the relevant statutes of limitations limit the plaintiffs' claims to West Chester's conduct after December 2, 2009.  11/8/13 Tr. at 6:23-7:7.  The IDEA includes a two-year statute of limitations.  20 U.S.C. § 1415(b)(6)(B); see also D.K. v. Abington Sch. Dist., 696 F.3d 233, 244 (3d Cir. 2012); P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009); Patrick B. ex rel. Keshia B. v. Paradise Protectory & Agr. Sch., Inc., No. 1:11-cv-00927, 2012 WL 3233036, at *4-5 (M.D. Pa. Aug. 6, 2012).  K.F.'s parents requested a due process hearing on December 2, 2011.  Admin. R., Ex. 15.  Thus, the Court discusses facts earlier than December 2, 2009, for context alone.

assessments, and documented K.F.'s reading difficulties and history of a specific learning disability in reading.  J-5; Admin R., Ex. 12, N.T. at 56-61.  Mr. Whittaker concluded that K.F.'s performance in reading and written expression was significantly below her grade level norms, and that she continued to be eligible for special education services.  J-5 at 13, 18.


### b. September 17, 2009 IEP

The 2009 reevaluation report was used by K.F.'s "IEP team," including her parents, to develop an IEP dated September 17, 2009.  J-7.  That IEP contains much of the information from the 2009 reevaluation.  The date of the IEP is approximately two weeks after the start of the ninth grade school year on September 2, 2009.  Pls.' Br. at 4.

The IEP indicated that K.F. was functioning at a fifth grade leading level at the start of ninth grade.  J-7 at 14. This IEP included several goals in reading comprehension, writing, spelling, and self-advocacy.  Id.  The Hearing Officer notes, "[a]lthough none of these goals included baselines, they were . . . objectively measurable."  Decision ¶ 16, at 3.  The IEP also included specific program modifications and specially designed instruction ("SDI") to assist K.F. in meeting her IEP goals.  J-7 at 15.

c. <u>Speech/Language Assessment and QRI</u>

Further evaluations of K.F. took place in October 2009.  West Chester obtained permission from K.F.'s parents for a standardized speech/language assessment and observation by a speech/language therapist.  J-9, J-10.  The speech/language evaluation concluded that K.F. did not qualify for speech/language SDI or other services.  J-10 at 3.

K.F. was given a Qualitative Reading Inventory ("QRI") assessment to further assess her reading ability.  The QRI indicated that K.F. could decode some words at a fifth grade level.  Her instructional reading level, however, was at the fourth grade level, largely due to problems with reading comprehension.  J-11 at 3.

d. <u>IEP Revision November 2009</u>

Following the speech/language assessment and the QRI, the IEP team met on November 6 and 13, 2009.  J-15.  During those meetings, K.F.'s reading goal was revised to "an instructional level of 5.0 and an independent level 6.0."  J-15 at 11.  The IEP also more explicitly described the reading strategies to be used with K.F.  J-15 at 13.

As part of her ninth grade reading instruction, K.F. used the <u>Read Naturally</u> reading program.  The plaintiffs argue that <u>Read Naturally</u> is designed for fluency instruction, not

comprehension, and that it did not produce measurable results for K.F. Pls.' Br. at 9-10. By the end of ninth grade, however, K.F. was averaging between 100 and 110 words per minute with seventy percent comprehension at the 5.8/6.0 level in <u>Read Naturally</u>. J-24 at 6.

     e. <u>IEP Revision May 2010</u>

        K.F.'s IEP team reconvened on May 3 and 10, 2010. J-17 at 2, J-20 at 2. K.F.'s courses were selected for the next school year, and K.F. was found eligible for extended school year ("ESY") services to maintain her reading levels over the summer vacation. J-20. West Chester proposed <u>Read Naturally</u> instruction during the summer break for one hour per day between June 28 and July 29, 2010. J-19 at 1.[3]

        At this meeting, the IEP section entitled "Present Levels" was updated to include input from both K.F. and her teachers. J-17 at 6-7. The IEP's spelling goal was removed, but the reading and self-advocacy goals remained in place. <u>Compare</u> J-15 at 11, <u>with</u> J-20 at 17. Furthermore, the program

---

    [3] K.F.'s parents chose instead to put her in a private program, and therefore K.F. did not receive the ESY services offered by West Chester in summer 2010. K.F.'s parents did purchase <u>Read Naturally</u> for their own home use with K.F. during that summer break. Admin R., Ex. 8, N.T. at 1482; Admin R., Ex. 7, N.T. at 1570, 1740-42; Admin R., Ex. 6, N.T. at 1863-65.

modifications and SDI were revised to include daily, one-on-one direct reading instruction.  J-20 at 19.


f. IEP Revision June 2010

Another IEP team meeting was held on June 14, 2010, that resulted in a revised reading goal that raised K.F.'s reading level to an instructional level of 6.0 and an independent level of 7.0.  J-24 at 14.  The writing goal was increased, and a vocabulary goal was added.  J-24 at 14-15.  The June 2010 IEP added SDI, including "[d]irect, systematic, sequential, instruction using a researched based reading program."  J-24 at 16.[4]


2. 2010-2011 (Tenth Grade)

K.F. started off her tenth grade year with direct instruction by a special education teacher in the Linguistics class using Read Naturally.  Due to her progress, K.F. was then moved in late 2010 to the Academic Literacy general education course taught by a reading specialist.  J-33 at 7, Admin. R., Ex. 10, N.T. at 886-88, Admin. R., Ex. 8, N.T. at 1197-98.  West

---

[4] The Hearing Officer concluded that throughout ninth grade, K.F. learned and used strategies to decode words while experiencing significant difficulties with reading fluency and comprehension.  Decision ¶ 21, at 4.

Chester also provided Read Naturally in the Academic Literacy class.  J-34.

### a. Independent Evaluation October 2010

K.F.'s parents had her independently evaluated by Dr. Robert Zeitlin in October 2010.  According to the evaluation, K.F.'s mother was concerned that K.F.'s reading comprehension was poor, but also that her Linguistics reading class was not challenging enough.  J-29 at 3.

The independent evaluation concluded that K.F. was hindered by attentional and working memory issues that were attributable to ADHD.  J-29 at 22.  The psychologist also concluded that K.F. still needed "a great deal of reading and writing support," but that her "attention deficits and depressive thought pattern" must be addressed "before these academic supports can have a positive effect."  Id.

K.F.'s parents did not disclose this evaluation to West Chester out of fear that West Chester would use it to reduce or eliminate reading services until K.F.'s emotional and attentional issues were resolved.  Admin R., Ex. 6, N.T. at 1871-76.

b. <u>QRI October 2010</u>

Around the same time as Dr. Zeitlin's independent evaluation, West Chester administered another QRI to K.F.  J-30. The results of the QRI were somewhat inconsistent, but the evaluator concluded that K.F. could read independently at the sixth grade level in both vocabulary and comprehension.  <u>Id.</u> at 2.  The evaluator recommended work in thinking while reading, vocabulary, and fluency.  <u>Id.</u> at 4.

c. <u>IEP Revision October 2010</u>

Another IEP team meeting was held on October 25, 2010, to adjust K.F.'s IEP based on the QRI results.  J-33.  The IEP was revised to include vocabulary goals and an objectively measurable reading comprehension goal.  J-33 at 15-16.  SDI related to organizational needs was increased.  J-33 at 18-20.

d. <u>Independent Evaluation February 2011</u>

The parents obtained another independent educational evaluation in February 2011 from Dr. Margaret Kay.  J-40.  The 2011 evaluation indicates that K.F. suffers from attentional deficits and reading deficits, especially in basic reading

skills, reading comprehension, fluency, and writing.[5]   J-40 at
20-21.  K.F. was shown to suffer from speech/language deficits,
such as in receptive and expressive language and phonological
awareness.  J-40 at 12-14.  The standardized testing results
placed K.F. in the third percentile relative to other same-age
peers in total reading, the thirteenth percentile for word
reading, and the first percentile in reading comprehension.  J-
40 at 16-17.[6]  In this evaluation, K.F. was diagnosed with double
deficit dyslexia.  J-40 at 15.


### e. IEP Revision March 2011

         K.F.'s parents shared the independent evaluation with
West Chester, and K.F.'s IEP team was convened as a result on
March 31, 2011.  The IEP was revised to include reports on
K.F.'s progress in reading, including that she was scoring
highly on reading comprehension probes at the 6.0 grade level
and within a range of forty percent at the 7.0 grade level.  The
progress report also shows that she was mastering vocabulary
goals.  J-46 at 6.

---

     [5] The Hearing Officer's decision correctly notes that these
areas are those targeted in IEP goals.  Decision ¶ 42, at 6.

     [6] The 2011 independent evaluation identified mostly the same
needs that had been identified by the District, but the
standardized test results reported in the independent evaluation
indicated that K.F. was performing at a lower reading level than
demonstrated on West Chester's QRI.  Decision ¶ 43, at 6.

K.F.'s IEP was revised to eliminate the current reading comprehension goal and update it to reading selections at the ninth grade level.  J-46 at 15-16.  A transition goal was added to have K.F. complete a career interest survey and then participate in resulting activities.  Id. at 16.

Finally, an SDI was added that called for K.F. to receive "[d]irect instruction, for decoding & fluency, in reading via a multisensory, systematic, sequential program."  J-46 at 18.  As noted by the Hearing Officer, "[i]n the context of this case, that language is code for the Wilson Reading System (Wilson)."  Decision ¶ 47, at 7.[7]

### f. Wilson Tutoring

West Chester hired an independent Wilson reading instructor to work with K.F. in a one-on-one setting for two periods per day, five days per week.  K.F.'s Wilson instruction started on April 4, 2011.  This instruction was provided in addition to the Read Naturally program in K.F.'s Academic Literacy class.  When the original Wilson instructor could not continue her instruction for a limited time due to medical

---

[7] The Wilson Reading System is a resource to teach reading with structured phonics.  J-40 at 24.  It is a research-based structured language program that includes multi-sensory, systematic, direct, and diagnostic instruction.  It teaches total word structure for encoding and decoding, and it also emphasizes fluency.  Id. at 25.

reasons, the school temporarily replaced her with another Wilson instructor.  J-46 at 18; Admin. R., Ex. 10, N.T. at 597-600, 627-28, 681, 708; Admin. R., Ex. 9, N.T. at 968-69; Admin. R., Ex. 8, N.T. at 1209, 1231-32.  Overall, the Wilson program was delivered as planned, except for occasional absences by either K.F. or the instructor.  K.F. was able to complete eleven of twelve parts of the Wilson program, and she was scheduled to complete the entire Wilson program by March 2012.  Admin. R., Ex. 9, N.T. at 1013, 1021-32, 1062.[8]

### 3. 2011-2012 (Eleventh Grade)

During eleventh grade, K.F. continued to receive Wilson instruction for two periods per day, five days per week, which the plaintiffs concede was appropriate to address decoding and encoding.  Admin R., Ex. 9, N.T. at 944-45; 11/8/13 Tr. at 15:25-16:2, 47:13-21.

### a. IEP Revision January 2012

After several IEP meetings, and an independent evaluation in January 2012 by Dr. Staci Heindel, K.F.'s IEP was amended on January 23, 2012.  The revised IEP targeted fluency

---

[8] K.F. also received Wilson ESY instruction during the summer of 2011.  J-48 at 22; Admin. R., Ex. 9, N.T. at 944-45.

at an eighth grade level and comprehension at the ninth grade
level.  J-74, J-77 at 22.

### b. Removal of K.F. from West Chester to Attend Woodlynde

K.F.'s parents unilaterally removed her from West
Chester and enrolled her in the Woodlynde School on February 2,
2012.  Compl. ¶ 44.

### C. K.F.'s College Acceptance

The parties provided the Court with additional
information on K.F.'s college acceptances and enrollment, which
was not before the Hearing Officer.  They stipulated that K.F.
was accepted for 2013-14 enrollment at West Chester University,
Kutztown University, Lock Haven University, Widener University,
West Virginia University, Marshall University, and Keuka
College.  She was not accepted to Marist College.  K.F. was
attending Marshall University in West Virginia.  Defendant's
Motion for Hearing Additional Evidence, Ex. A, ECF No. 15-2.  At
oral argument, the plaintiffs' counsel informed the Court that
K.F. is no longer attending college.  11/8/13 Tr. at 18:11-19,
45:23-24.

D. <u>The Due Process Hearing</u>

On December 2, 2011, K.F.'s parents requested a special education due process hearing, which was held before Hearing Officer Brian Jason Ford on February 6, March 7, March 12, May 1, May 16, June 11, July 30, and August 1, 2012.  Both parties were represented by counsel.

K.F.'s mother testified at the hearing, and the parents called the following witnesses:  Dr. Margaret Kay, who performed the 2011 independent evaluation; Dr. Kelly Barton, the parents' educational advocate; Dr. Christopher Fulco, headmaster of Woodlynde; Percell Whittaker, school psychologist; Lisa Phifer, special education supervisor; Deborah Kelsch, special education case manager; Kimberly Phillips, teacher; Laura Pfanders, teacher; Tracy Hill, guidance counselor; and Leslie Wallace, <u>Wilson</u> tutor.  In addition, West Chester called two of K.F.'s teachers, Eileen Riley and Kimberly Carr, to testify. Both parties submitted exhibits and a written closing argument.


E. <u>The Hearing Officer's Findings of Fact and Decision</u>

The Hearing Officer issued his findings of fact and decision on October 5, 2012.  The Hearing Officer found that West Chester's 2009 reevaluation report was inappropriate and constituted a procedural violation of the IDEA and its implementing regulations.  Decision at 15.  The Hearing Officer

concluded, however, that those defects did not result in a substantive denial of a FAPE, and West Chester provided a FAPE to K.F. at relevant times.   Id.

The Hearing Officer delineated his findings of fact in fifty-seven numbered paragraphs.  Based on those factual findings, the Hearing Officer concluded, "the District has met and exceeded its legal obligations to the Student in this case. There is preponderant evidence that the Student made meaningful progress at all times.  The District provided a FAPE to the Student, and so the Parents are not entitled to the relief that they demanded."  Decision at 14.


II. Analysis

A. Legal Standards

Under the IDEA, states receiving federal public-education funding are required to provide a free appropriate public education ("FAPE") to children with a disability.  20 U.S.C. § 1412(a)(1); Mary Courtney T. v. Sch. Dist. of Phila., 575 F.3d 235, 240 (3d Cir. 2009).  A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 188-89 (1982).

This entitlement is ensured through the creation of an IEP.  An IEP is a written document developed for each student. The IEP must be "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential."  Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004) (internal quotation marks omitted).  By law, it must include several elements, including a statement of the student's "present levels of academic achievement and functional performance," a statement of "measurable annual goals," a description of the progress towards those goals, and a list of the supplementary aids, services, and individual accommodations provided to the student. 20 U.S.C. § 1414(d)(1)(A).  The adequacy of an IEP is calculated as of the time it is offered to the student.  Fuhrmann ex rel. Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993).

The educational benefit provided by the school through the IEP must be more than de minimis; it must be meaningful when viewed "in relation to the child's potential."  Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 185 (3d Cir. 1988).  The IDEA requires a plan of instruction under which some educational progress is likely.  Id. at 183.  A district does not have to provide "the optimal level of services," so long as a "basic floor of opportunity" is made available.  D.S. v.

Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010).  There
is no bright-line rule to determine whether a student is
receiving a meaningful educational benefit.  Id. at 568.
Instead, courts look at all of the factors relevant to that
student's educational potential.

        The initial determination of whether the school has
provided a FAPE is made at a due process hearing.  34 C.F.R.
§ 300.507; 22 Pa. Code § 14.162.  Any party aggrieved by the
findings and decision in the due process hearing has the right
to bring a civil action in state or federal court.  20 U.S.C.
§ 1415(i)(2)(A).


        1. District Court Review of an IDEA Claim

        "When parents challenge a school's provision of a FAPE
to a child, a reviewing court must (1) consider whether the
school district complied with the IDEA's procedural requirements
and (2) determine whether the educational program was
'reasonably calculated to enable the child to receive
educational benefits.'"  Mary Courtney T., 575 F.3d at 249
(quoting Rowley, 458 U.S. at 207).

        A district court "(i) shall receive the records of the
administrative proceedings; (ii) shall hear additional evidence
at the request of a party; and (iii) basing its decision on the
preponderance of the evidence, shall grant such relief as the

court determines is appropriate." 20 U.S.C § 1415(i)(2)(C). The party bringing the civil action and challenging the Hearing Officer's determination bears the burden of proving its case as to the claims it brings. Ridley Sch. Dist. v. M.R., 680 F.3d 260, 270 (3d Cir. 2012).

A district court reviewing an IDEA claim does so under a "modified de novo" standard. S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir. 2003). The district court must give "due weight to the underlying administrative proceedings." Id. (internal quotation marks omitted).

If the district court does not consider evidence outside of the administrative record, any conclusions contrary to the Hearing Officer's must be supported in the record and "the court must explain why it does not accept" the Hearing Officer's findings of fact. Id. Factual findings from the administrative proceedings are to be considered prima facie correct. Id.

The court should "defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." Id. (quoting Carlisle Area School v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995)).

20

Judicial review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

## 2. Adequacy of IEP

The IDEA sets forth procedural and substantive obligations that the school district must fulfill to provide a FAPE to disabled students.  20 U.S.C. §§ 1401(9), 1412(a)(1). The content of an IEP does not implicate the IDEA's procedural requirements, because content goes to the substantive aspects of the IEP.  D.S., 602 F.3d at 565.

The Court judges the IEP's content by whether the student's IEP was "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 207.  The phrase "reasonably calculated" suggests something less than the absolute certainty and precision afforded by hindsight. Evaluating the appropriateness of an IEP must not be based on an after-the-fact "Monday Morning Quarterbacking" analysis. Rather, the appropriateness of an IEP is to be judged according to the information the school district had at the time the IEP was created.  Fuhrmann, 993 F.2d at 1040-41 (3d Cir. 1993).

The IDEA requires that "school districts prepare the IEP's based on the student's needs; so long as the IEP responds

to the needs, its ultimate success or failure cannot retroactively render it inappropriate." Carlisle, 62 F.3d at 534.  A court may, however, use evidence of educational progress as evidence that the IEP was appropriate when created.  D.S., 602 F.3d at 564-65 (citing Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 762 (3d Cir. 1995)).


### 3. Procedural Violations of the IDEA

"A procedural violation of the IDEA is not a per se denial of a FAPE; rather, a school district's failure to comply with the procedural requirements of the Act will constitute a denial of a FAPE only if such violation causes substantive harm to the child or his parents."  C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 66-67 (3d Cir. 2010) (quoting Knable ex rel. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 765 (6th Cir. 2001)); see also D.S., 602 F.3d at 565-66.

Under the implementing regulations, substantive harm occurs only if the preponderance of the evidence indicates that

> the procedural inadequacies-- (i) [i]mpeded the
> child's right to a FAPE; (ii) [s]ignificantly impeded
> the parent's opportunity to participate in the
> decision-making process regarding the provision of a
> FAPE to the parent's child; or (iii) [c]aused a
> deprivation of educational benefit.

34 C.F.R. § 300.513(a)(2).

22

B. <u>The Parties' Challenges Under the IDEA</u>

K.F.'s parents request that this Court reverse the Hearing Officer's decision.  Her parents emphasize that West Chester did not identify K.F.'s dyslexia or adequately address her difficulties in decoding and encoding, fluency, reading comprehension, or written expression during her tenure at West Chester.  Pls.' Br. at 1-2; Pls.' Opp. Br. at 6.  West Chester argues in support of the Hearing Officer's decision, except to state that the 2009 reevaluation report was also appropriate.

C. <u>K.F.'s 2009 Reevaluation</u>

As admitted by the parties, the relevant statute of limitations limits this Court's consideration to events that occurred after December 2, 2009.  Therefore, the appropriateness of the reevaluation is not directly before this Court.  The Court considers, however, the effect of the reevaluation on constructing K.F.'s IEPs and the provision of other services for K.F.  Because the flawed reevaluation is a procedural violation of the IDEA, the Court must determine whether it caused substantive harm to K.F.  Decision at 15.  The Court concludes there is no substantive harm to K.F., amounting to a denial of a FAPE, based on the reevaluation.

The Hearing Officer concluded that K.F.'s 2009 reevaluation was inappropriate.  <u>Id.</u> at 12.  First, the

evaluator did not closely scrutinize the IEPs that K.F. received before she was homeschooled.  Second, the evaluator mainly focused on whether K.F. qualified for IDEA services, rather than information or recommendations about how the IEP team can address K.F.'s disability.  Id. at 11.  Lastly, identification of a specific learning disability in reading without more information does not satisfy IDEA standards.  Id.  The Hearing Officer concluded, "The Parents are correct that the information contained therein was necessary but insufficient when held against IDEA standards."  Id. at 12.

The Hearing Officer emphasized:

> [W]ithout saying the words "double deficit dyslexia" the District found that the Student had an SLD [specific learning disability] in the area of reading and required special education.  The fact that the RR concludes that the Student had an SLD but did not say the word "dyslexia" matters for purposes of compensatory education only if that failure resulted in a substantive denial of FAPE.

Id. at 11.  The IDEA recognizes dyslexia as a disability under the category of a specific learning disability, which was identified by West Chester.  See 34 C.F.R. § 300.8(c)(10)(i).

Because the Hearing Officer concluded that "the inappropriateness of the 2009 RR does not mean that the Student was denied a FAPE per se," he went on to analyze how West Chester used the reevaluation report to construct K.F.'s IEPs.  Decision at 12.  The reevaluation report was only the starting

point for the IEP team's discussion that resulted in further
speech/language assessment and the reading QRI analysis.  West
Chester then adjusted K.F.'s IEP according to further testing
throughout the 2009-2010 school year.  The Hearing Officer
concluded, "[T]he 2009 RR was flawed to the point of
inappropriateness but was not the only source of information for
the IEP Team in program development."  Id. at 12.

K.F.'s parents argue that the further testing by West
Chester, including the speech and language evaluation, was
insufficient because it lacked assessment of her phonological
processing or how well she could process language at a normal
rate of speed.  Pls.' Mot. ¶ 24, at 5 (citing Admin. R., Ex. 11,
N.T. at 295).

West Chester agrees with the Hearing Officer's
conclusion that "any deficiencies that may have been associated
with the District's reevaluation were remedied by the District's
subsequent and continual collection of additional test data as
well as its monitoring of data from the Student's response to
instruction."  Def.'s Opp. Br. at 6.  West Chester argues that
these actions were consistent with the IDEA regulations
requiring the evaluation to assist in determining the content of
the IEP, with the IEP then revised continually, as appropriate.
See 34 C.F.R. §§ 300.304(b), 300.324(b).

There is no evidence in the record to demonstrate that K.F. was substantially harmed by the flawed reevaluation in her provision of special education services in ninth grade or her following years at West Chester.  The Hearing Officer's decision that a FAPE was not denied as a result of the procedural violation is supported in the record by the Court's review of K.F.'s later IEP revisions and extensive testing that K.F. underwent to provide further information on her disability and appropriate academic placement.

D. FAPE for 2009-2010 (Ninth Grade)

The Court notes that K.F. arrived at West Chester in ninth grade after being homeschooled for part of fifth grade through eighth grade.  J-29 at 2, J-40 at 6.

1. Timing of Initial IEP

K.F.'s parents argue that West Chester did not have an IEP in place for her by the first day of ninth grade, as required by 20 U.S.C. § 1414(d)(2).  Rather, K.F. was offered an IEP approximately two weeks later, on September 17, 2009.  Pls.' Mot. ¶¶ 28-30, at 6; J-7.  West Chester counters that such a procedural violation is not a per se substantive deprivation of a FAPE, and no rights of the child of the parents were impeded.  Def.'s Opp. Br. at 7-8.

The Third Circuit found no denial of a FAPE as the result of an IEP not being in place on the first day of school, emphasizing that "[d]espite some initial delays in finalizing the authorization, [the student] was evaluated by a District psychologist a month before the start of school and an IEP team convened shortly thereafter to develop his educational program." C.H., 606 F.3d at 69.  The same process was in place here, whereby K.F. was evaluated prior to the start of school, with the IEP team working on the evaluation afterward, and therefore there is no substantive harm to K.F. due to the two-week delay.

### 2. Reading Instruction

K.F.'s parents argue that she was not provided with an appropriate reading program in ninth grade.  Pls.' Br. at 8. Their main argument is that Read Naturally was not the appropriate program for K.F. because it was simply what was available in the building, rather than addressing K.F.'s specific reading comprehension needs.  Pls.' Br. at 9-10. Furthermore, they argue that West Chester should have known that Read Naturally was not effective because K.F. stayed on the 5.6 reading level for eight months and was moved up to the 5.8/6.0 reading level because she had become frustrated at the 5.6 level.  Pls.' Br. at 10 (citing Admin. R., Ex. 10, N.T. at 848).

The District contests these points, including that Read Naturally does include reading comprehension instruction, and that K.F.'s progress was not artificially inflated, but rather K.F. performed inconsistently on West Chester's attempts to monitor her progress.  Def.'s Opp. Br. at 11.

The Hearing Officer concluded that, although the Read Naturally program was generally available at West Chester, its choice for K.F. was not "arbitrary."  Decision at 12. Furthermore, West Chester monitored K.F.'s progress through Read Naturally, which was reported at IEP revision meetings and to K.F.'s parents.  Id.

K.F.'s parents also argued to the Hearing Officer that K.F. would have made more progress had West Chester provided her with Wilson instruction in ninth grade.  The Hearing Officer disposed of that argument by stating that, even if true, it does not change his conclusion that West Chester provided a FAPE to K.F. during that time period.  That is because West Chester is not obligated to provide an "optimal education" or "to maximize the benefit of educational services."  Decision at 13.

### 3. Decoding, Fluency, and Written Expression

K.F.'s parents argued that in the area of decoding, K.F.'s progress was not being monitored and Read Naturally was not the appropriate tool to deal with her deficit in that area.

The IEP team did, however, identify decoding as an educational need in November 2009.  Pls.' Br. at 14-15.

Similarly, K.F.'s parents argue that fluency was not identified in the ninth grade IEP and was therefore not monitored.  Her parents admit, however, that Read Naturally is designed for fluency instruction.  Pls.' Br. at 18-19.

K.F.'s parents further argue that K.F. did not receive a FAPE in the area of writing in ninth grade.  The parents do discuss, however, that the ninth grade IEP contains goals referencing use of a graphic organizer to write five paragraphs with appropriate grammar, detail, and writing conventions.  Pls.' Br. at 23 (citing J-7 at 14-15, J-15 at 11-12).

West Chester cites evidence in the record that K.F.'s IEPs contained goals and SDI for written expression.  Def.'s Opp. Br. at 14 (citing J-7 at 14-15, J-15 at 11-12, J-17 at 16-18, J-20 at 17, 19, J-24 at 14, 16, J-33 at 15, 18 (IEPs from ninth grade), J-46 at 15, 18, and 21, J-48 at 15, 18, 20, J-50 at 15, 18, 20 (IEPs from tenth grade), J-55 at 21, 24, 27, J-77 at 21, 24, 27, J-85 at 15, 18, 21 (IEPs from eleventh grade)).

Ultimately, the school district argues that K.F.'s assessments illustrate her progress during her ninth grade year, which the Hearing Officer acknowledged by stating that despite her "severe learning disabilities," K.F. made "slow, consistent progress."  Decision at 13-14.  For example, when K.F. was

assessed by the reading specialist in October 2010 using the
same method as when she was assessed in October 2009, her
reading level had improved from fourth grade to an upper middle
school level.  Def.'s Br. at 12-13 (citing J-30 at 2).


### 4. Assessment Results

The Court agrees with the Hearing Officer that K.F.
was adequately evaluated by numerous "objective, standard,
normative assessments," including those obtained through
independent evaluations.  As demonstrated by the chart
reproduced in the Hearing Officer's opinion, K.F.'s scores on
these types of assessments largely stayed the same over time.

Because those scores are standardized based on age or
grade level, if a student's standard score stays the same, the
student has remained in the same place in relation to his or her
peers at the same age or grade level.  For example, if a student
has a very similar score after advancing a grade or aging one
year, the score indicates that the student made approximately
one year of progress during that time.  If a student makes
little or no progress over time, and then is tested at a later
date, the standardized score should be lower because the student
has not made the same average level of progress as his or her
classmates.  Decision at 12.  This reading of the scores was

explained numerous times in the testimony.  See, e.g., Admin.
R., Ex. 11, N.T. at 440-41.

K.F.'s scores on various tests, which the Hearing
Officer admits are not an "apples to apples comparison,"
generally show that K.F. has made progress over time.  Decision
at 13; see also Decision at 8-9 (Chart B:  Ability and
Achievement Scores).  This show of progress over time holds for
all grade years at issue, as the scores are from 2009 to 2012,
not just K.F.'s ninth grade year.  The various measures
indicating K.F.'s progress demonstrate that she received a
meaningful benefit from West Chester's programming in ninth
grade.  Although K.F. may not have received the optimal benefit
during her ninth grade year, West Chester worked with K.F. and
her parents to meaningfully assess K.F.'s needs after over three
years out of the public school system.


E. FAPE for Summer 2010 (ESY)

Extended School Year ("ESY") services are intended to
prevent loss of attained skills in targeted student populations
at risk for regressing during long programming breaks, or who
are at risk of taking an undue amount of time to recoup such
skills or who meet other criteria outlined in the Pennsylvania
education regulations.  34 C.F.R. § 300.106; 22 Pa. Code
§ 14.132.  ESY eligibility is predicated upon measurable

evidence of regression or recoupment difficulties associated
with skills and behaviors that are addressed in the student's
IEP.  Progress on goals in consecutive IEPs also provides
information for determining ESY eligibility.  22 Pa. Code
§ 14.132(b).

        K.F.'s parents argue that West Chester's ESY offering
was "wholly inadequate to confer FAPE" because the district did
not understand K.F.'s reading disability and knew that K.F. made
little progress using Read Naturally during ninth grade.  Pls.'
Br. at 21.  The parents argue that West Chester should have
known that K.F. needed Wilson instruction during the summer of
2010, and its "failure to offer or provide it constituted a FAPE
violation."  Id.

        West Chester argues that it proposed ESY instruction
to support the reading goal in K.F.'s IEP.  Def.'s Br. at 14
(citing J-17 at 22, J-20 at 23).  That ESY plan proposed one
hour daily of reading instruction, four days per week, from June
28 through July 29, 2010.  Id. (citing J-19 at 1).  K.F.'s
parents neither approved nor disapproved of the proposal, but
instead elected that K.F. participate in a private program and
to administer Read Naturally themselves over the summer.  Id.
(citing Admin R., Ex. 8, N.T. at 1482; Admin R., Ex. 7, N.T. at
1570, 1740-42; Admin R., Ex. 6, N.T. at 1863-65).  West Chester
argues that, even though it offered Wilson program to K.F. in

2011, consideration of that fact should not be considered when evaluating its ESY plan in 2010.  Def.'s Opp. Br. at 15.

The Hearing Officer was conclusory in his statements regarding the 2010 ESY offer, simply stating, "I find that the amount of progress that [K.F.] . . . actually made is both meaningful and commensurate with the amount of progress anticipated in the various IEPs.  The District's ESY offer in the summer of 2010 was appropriate for the same reasons." Decision at 13.

West Chester's ESY offering fit with its ninth grade reading instruction for K.F., and the Court finds the arguments that, in hindsight, <u>Wilson</u> should have been provided are unconvincing.

F. <u>FAPE for 2010-2011 (Tenth Grade)</u>

1. <u>Reading Instruction</u>

K.F.'s parents argue that K.F. did not receive a FAPE in the area of reading because <u>Read Naturally</u> was not the best program to help her.  Her parents admit that K.F. continued her reading instruction in the Linguistics classroom through <u>Read Naturally</u>, but that she was also provided with a separate period of one-on-one reading support each day using <u>Read Naturally</u>. Pls.' Br. at 10-11.  K.F.'s parents also argue that her reported progress using <u>Read Naturally</u> was "misleading."  Pls.' Br. at 11

33

(citing Admin R., Ex. 8, N.T. at 1428-29).  Furthermore, K.F.'s
parents argue that her amended June 2010 IEP that called for
direct, systematic, sequential reading instruction using a
research-based program was inappropriate because it still used
Read Naturally.  Pls.' Br. at 11-12.  K.F. started receiving
Wilson instruction in April 2011.

　　　　West Chester argues that a preponderance of the data
showed meaningful progress in reading from ninth to tenth grade,
because K.F. functioned at the fourth or fifth grade level when
she started school in ninth grade and by the beginning of her
tenth grade year started to read at an eighth grade level.
Def.'s Opp. Br. at 11 (citing J-7 at 14, J-11 at 3, J-33 at 6,
J-42 at 5, Admin. R., Ex. 10, N.T. at 865, 869-70).

　　　　At the beginning of her tenth grade year, K.F.'s
reading teacher determined her instructional reading level to be
fifth to sixth grade using the Read Naturally curriculum probes.
J-42 at 5, Admin. R., Ex. 10, N.T. at 869.  K.F.'s IEP reading
goal for tenth grade called for her to develop her reading
comprehension skills to sixth and seventh grade levels.  J-24 at
14.  By the end of October 2010, K.F. was performing somewhat
successfully with eighth grade reading probes.  J-42 at 5, Admin
R., Ex. 10, N.T. at 870.  Due to this progress, K.F.'s IEP team
moved her from direct instruction by a special education teacher
in the Linguistics class using Read Naturally to the Academic

34

Literacy general education course taught by a reading specialist.  J-33 at 7, Admin. R., Ex. 10, N.T. at 886-88, Admin. R., Ex. 8, N.T. at 1197-98.  The school district also argued that testing showed progress in reading through the end of her tenth grade year.  Def.'s Opp. Br. at 11-12 (citing J-27 at 3, J-50 at 6, Admin R., Ex. 6, N.T. at 1922-25).

### 2. Decoding, Fluency, and Written Expression

K.F.'s parents argue that K.F. did not receive a FAPE in the area of encoding and decoding in tenth grade for the same reasons as in ninth grade, until she began the Wilson program in April 2011.  Pls.' Br. at 16.  Her parents emphasize that a September 2010 evaluation shows problems in the area of decoding, and that further psychological evaluations showed inadequate decoding skills.  Pls.' Br. at 16-17.

K.F.'s parents state that a FAPE was denied in the area of fluency because fluency was not incorporated into the IEP until after the independent evaluation from Dr. Kay, and Dr. Kay's specific recommendations were not incorporated.  Pls.' Br. at 19-20 (citing J-33 at 15-16, J-40 at 26-27).  West Chester cites evidence in the record that between October 2010 and September 2011, K.F. made meaningful progress in reading comprehension, fluency, and vocabulary.  Def.'s Br. at 15-16 (citing J-50 at 6, J-53, Admin R., Ex. 6, N.T. at 1919-25).

35

With regard to writing, K.F. was allegedly denied a FAPE because she only received graphic organizers, but no SDI or assistive technology.  Pls.' Br. at 25.  West Chester emphasizes the testimony of K.F.'s eleventh grade English teacher that K.F. made progress in written expression while in her class.  Def's Opp. Br. at 14 (citing Admin R., Ex. 5, N.T. at 2019-2160). Data collected by the IEP team demonstrates meaningful progress on written expression goals as well.  Def.'s Br. at 15-16 (citing J-33 at 7, J-42 at 2, J-48 at 7, J-50 at 7).

The Hearing Officer provided no conclusions specific to tenth grade, only stating that "[b]y May of 2011, the IEP Team was drafting goals that targeted the Student's reading comprehension of passages at the ninth grade level, indicating four years of progress in two years as measured by grade level. Grade level may be the least accurate or meaningful indication of progress, but objective testing also indicated progress at the same time."  Decision at 13.  The Hearing Officer also relied on the chart illustrating K.F.'s scores over time as showing her progress.  See Decision at 8-9 (Chart B:  Ability and Achievement Scores).

K.F. was making progress, albeit more slowly than her parents might like, prior to the institution of the Wilson program.  K.F.'s progress was monitored and her IEP revised to reflect changes in her evaluation.  The Court is not persuaded

by K.F.'s parents' arguments in the face of the evidence produced by West Chester, and agreed with by the Hearing Officer, that K.F. did receive a meaningful benefit from her tenth grade education in all of the relevant areas.

G. FAPE for 2011-2012 (Eleventh Grade)

K.F.'s parents identify only two areas where she was allegedly denied a FAPE in eleventh grade:  fluency and written expression.  K.F. had low measures of fluency on independent examinations paid for by her parents and achieved less than her IEP's fluency goal.  Pls.' Br. at 20-21.

K.F.'s parents stated that she was denied a FAPE in the area of written expression during eleventh grade for the same reasons as during ninth and tenth grades.  Pls.' Br. at 26. After K.F.'s IEP revision in January 2012, her parents were concerned that deficits in writing would not be addressed until after K.F. completed her Wilson instruction.  Id. (citing J-77 at 26).  Furthermore, her parents argue that inconsistent information was provided about the program to be used to assist K.F.'s writing, what rubric would be used to gauge her progress, and who would be implementing the program.  Id. at 26-28.

With regard to writing, K.F. was able to meet her written expression goals at the end of her tenth grade year. J-48 at 7-8.  At the IEP team meetings in January 2012, the IEP

team reviewed K.F.'s teachers' use of, and results from, various scoring rubrics for assessing K.F.'s written expression skills and introduced additional SDI.  J-77 at 6-12, 26-27, 37-43.

The Hearing Officer did not break down his conclusions regarding FAPE by school year, although he concluded that K.F. received a FAPE for all time periods at issue.  The Hearing Officer emphasized that West Chester was "providing a very high level of 1:1 Wilson instruction" and that such a level of services is "unprecedented."  Decision at 13.

The Hearing Officer further credited the Wilson instruction as above and beyond what was required by the IDEA because K.F.'s

> slow, consistent progress prior to the introduction of
> Wilson very likely would have satisfied the District's
> obligations.  The fact that the District added
> extraordinary services beyond what it is ordinarily
> required to provide[], combined with the evidence of
> the Student's actual, meaningful progress, compels me
> to conclude that the IDEA has not been violated in
> this case.

Decision at 13-14.

The evidence in the record does not convince the Court that the Hearing Officer's conclusion was incorrect.  The Court agrees that K.F. received a FAPE during her eleventh grade year because she did make meaningful progress in writing and fluency, especially with continued use of the Wilson program.

H. Assistive Technology

One issue the plaintiffs raise with regard to both FAPE and disability discrimination is whether K.F. was provided with assistive technology.  K.F.'s IEPs do not list her as eligible for assistive technology.  She was, however, provided with related services, including "[a]ccess to technology for use & support with word prediction, text reading, graphic organizing & talking word processor."  J-46 at 21.  K.F. received a netbook by the summer of 2011 with the software package Solo Suite to assist her with writing.  Admin. R., Ex. 6, N.T. at 1995.

These related services first appeared in the March 2011 IEP revision for K.F. to use in all regular and special education classes.  J-46 at 21.  This technology was extended through the 2011 through 2012 school year.  J-48 at 20; J-50 at 20.  Furthermore, a webinar for the Solo Suite software was held and attended by many staff members.  J-57.  Although K.F.'s parents argue this was insufficient technology, and that the staff was not property trained, there is evidence that K.F. successfully used the program in her writing education at West Chester.  See, e.g., Admin. R., Ex. 7, N.T. at 1794-96; Admin R., Ex. 6, N.T. at 1918-19; Admin R., Ex. 5, N.T. at 2048-49, 2059, 2134-35.  The Court therefore does not believe that K.F. was denied a FAPE at any of the time periods at issue for lack of the appropriate assistive technology.

## I. Failure to Diagnose Dyslexia[9]

K.F.'s parents maintain that she should have been diagnosed with double deficit dyslexia earlier, and not in an independent evaluation.  It is worth noting that K.F. was not diagnosed with dyslexia by the school district's multiple evaluations or her parents' previous independent evaluations. Nor did the parents themselves ever raise dyslexia as a potential cause for K.F.'s learning problems.  K.F. was only diagnosed with double deficit dyslexia in a February 2011 independent evaluation conducted by Dr. Kay.  J-40 at 15.

It is not necessarily the case that West Chester's failure to diagnose K.F.'s dyslexia proves that her IEPs cannot be appropriate, especially because the IEPs were revised numerous times to incorporate the parents' suggestions and the independent evaluation results.  The Court therefore cannot determine as a matter of law that West Chester's failure to test for and diagnose K.F.'s dyslexia is fatal.  See Jonathan G. v. Lower Merion Sch. Dist., 955 F. Supp. 413, 417 (E.D. Pa. 1997).

## J. Discrimination Under the RA and the ADA

The RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of

---

[9] The issue of whether the failure to diagnose K.F.'s dyslexia in the reevaluation led to a denial of a FAPE was addressed above, in Section II.C.

her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any program that receives federal funds.  29 U.S.C. § 794(a). This prohibition was extended to public school systems through section 504.  Id. § 794(b)(2)(B).

To establish a violation of section 504 of the RA, K.F.'s parents were required to prove that (1) K.F. was disabled; (2) she was "otherwise qualified" to participate in school activities; (3) K.F. received federal financial assistance; and (4) K.F. was excluded from participation in, denied the benefits of, or subject to discrimination at West Chester.  M.R., 680 F.3d at 280-81 (citing Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 253 (3d Cir. 1999)).[10]

Section 504's "negative prohibition" is similar to the IDEA's "affirmative duty" and requires schools that receive federal financial assistance to "provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction."  W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995) (quoting 34 C.F.R. § 104.33(a)), abrogated

---

[10] The substantive standards for determining liability under the RA and the ADA are the same.  McDonald v. Pa. Dep't of Pub. Welfare, 62 F.3d 92, 94-95 (3d Cir. 1995).  All of the elements, except for the third element relating to federal funds, are required to establish a prima facie case of discrimination under the ADA.  42 U.S.C. §§ 12132, 12133.

on other grounds by A.W. v. Jersey City Pub. Sch., 486 F.3d 791

(3d Cir. 2007) (en banc).

     To offer an "appropriate" education under the RA, a

school district must reasonably accommodate the needs of the

handicapped child so as to ensure meaningful participation in

educational activities and meaningful access to educational

benefits.  M.R., 680 F.3d at 280-81; see also 34 C.F.R.

§ 104.33(b)(1) ("[T]he provision of an appropriate education is

the provision of regular or special education and related aids

and services that . . . are designed to meet individual

educational needs of handicapped persons as adequately as the

needs of nonhandicapped persons are met . . . ."); 34 C.F.R.

§ 104.33(b)(2) ("Implementation of an Individualized Education

Program developed in accordance with the Education of the

Handicapped Act is one means of meeting the standard established

in paragraph (b)(1)(i) of this section.").

     Because the plaintiffs do not make any arguments

beyond a denial of a FAPE, analysis of the discrimination issue

under section 504 of the RA and the relevant sections of the ADA

is the same as that under the IDEA.  See Jeremy H. v. Mt.

Lebanon Sch. Dist., 95 F.3d 272, 279 (3d Cir. 1996); see also

Grieco v. New Jersey Dep't of Educ., No. 06-4077, 2007 WL

1876498, at *4 (D.N.J. June 27, 2007).  For the same reasons

that there is no denial of a FAPE under the IDEA, the plaintiffs' claims under the ADA and RA also fail.

III.  Conclusion

K.F. arrived at West Chester for high school following a period of over three years of homeschooling.  K.F. then withdrew from West Chester after only two-and-a-half years of high school there.  In total, starting with elementary school, K.F. received less than five years of schooling provided by West Chester, during which she received special education services.

K.F.'s parents were, at all times, highly involved with every aspect of K.F.'s education and West Chester "time after time . . . clearly responded to and revised [K.F.'s] . . . IEP in response to information provided by and requests made by the Parents and their advocate."  Decision at 12 n.16.  Although K.F.'s IEPs and other special education services may not have been perfectly implemented from the outset, the continuous meetings, feedback, and revision of her special education plan provided K.F. with a meaningful benefit from her very limited time at West Chester.

After an independent review of the administrative record, the Court concludes that there is no denial of a FAPE for any of the time periods at issue, and thus the defendant's

motion is granted and the plaintiffs' motion is denied.  An
appropriate Order shall issue.